# CIRCUIT COURT NO. 2 OF BALTIMORE CITY

Filed March 4, 1890.

THOMAS J. CANNON
VS.
BALTIMORE & OHIO EMPLOYES'
RELIEF ASSN. ET AL.

*Geo. R. Gaither, Jr.,* and *W. S. Amoss* for plaintiff.

*Budnitz & McFarland* for Copley.

*Cowan & Cross* for the Relief Association.

WRIGHT, J.—

This case comes before the Court upon the application for the appointment of a receiver.

The defendant, The Baltimore and Ohio Employes' Relief Association, was chartered by a special act of the General Assembly in 1882 (Ch. 358, laws of 1882), and from that time until the 29th day of March, 1889, continued to carry on the business for which it was chartered. In 1888, the General Assembly, by Chapter 527, laws of 1888, undertook to repeal the charter of said association, the repealing statute to take effect on the 1st day of April, 1889. On the 29th day of March, 1889, the Committee of Management of the association, assuming to act for the association, entered into an agreement with the Baltimore and Ohio R. R. Co. by which it agreed to transfer to said company "all the property, assets, credits and securities now held or hereafter acquired by the association for or in connection with the business of its relief feature." (See Defendant's Exhibit B. & O. No. 2) which agreement is by the plaintiff claimed to be *ultra vires* and unlawful. The committee of management then adjourned *sine die*, and have not since that time attempted to do any act under their charter.

The plaintiff, who sues on his own behalf and on behalf of all the members and creditors of the Baltimore and Ohio Employes' Relief Association who may desire to become parties to this suit, was a member in good standing in said association at the time of the execution of said *agreement of transfer*, as I shall term it, and also on the 1st of April, 1889, the date on

which the repealing statute was to take effect.

The case has been argued before me from two standpoints:

First. That the repealing act is a valid and constitutional act.

Second. That even if the act should be held to be unconstitutional, the circumstances of the case are such that the plaintiff is entitled to the relief asked, namely, the appointment of a receiver, the relief being the same, it is claimed, whether the act be constitutional or otherwise. From the view I have felt compelled to adopt in the decision of the case, I do not deem it necessary to consider the second proposition; not for a moment, however, intimating that the relief asked should not be granted under that proposition.

The first question to be considered is, therefore, the constitutionality of the repealing act of 1888, and this can only be attacked, or at all events, has only been attacked, on the ground that it does not comply with the requirements of Section 29, Article 3, of the Constitution, so far as the same prescribes that "every law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title." And while it is not contended that there is more than one subject, still as it only purports to be "An Act to add four sub-sections to Section 2, Chapter 358, Acts of 1882, entitled 'An Act to incorporate the Baltimore and Ohio Railroad Employes' Relief Association'," and says nothing in regard to the repeal of the Act of 1882, the subject is not sufficiently described in the title.

This provision of the constitution has frequently been the subject of discussion before the Court of Appeals, and has always been most liberally construed; in fact, with the exception of the case of Stiefel vs. Trustees of the Blind Asylum, 61 Md. 144, no case has been brought to my notice where a statute has been declared unconstitutional on the ground that it did not comply with said constitutional provision.

In the last published volume of our reports (State vs. Norris, 70 Md. 91, 95), we find the latest decision on this point; C. J. Alvey, in delivering the opinion of the Court, says: "What the title of the Act is we have already recited. And it certainly requires a very liberal construction of the consti-

tutional provision to maintain the sufficiency of this title. The objects designed to be obtained by the constitutional provision are two fold: the first is to prevent the combination in one act of several distinct and incongruous subjects; and the second is that the Legislature and the people of the State may be fairly advised of the real nature of pending legislation. All titles of acts should, therefore, be so framed as to accomplish these objects. But, we regret to say, that in practice a strict observance of the terms of the Constitution has not always marked our legislation in this respect. Many acts are passed, and often of great importance, the titles to which are exceedingly deficient in definite and clear description of the subject matter of the act. But this Court has ever *been reluctant to defeat the will of the Legislature by declaring such legislation void, if by any construction it could possibly be maintained.* The title of the act in this case would not seem to be less clear and certain in the description of the subject of the act, than the titles to the acts involved in the cases of The Commissioners of Dorchester County vs. Meekins, 50 Md. 28, and The Commissioners of Talbot County vs. The Commissioners of Queen Anne's County, Id. 245. In those cases the titles of the acts were held by a majority of the Court to be sufficient to gratify the constitutional requirement, and upon the same principle and reasoning, we think, the title to the act here involved must be held to be sufficient."

In Comrs., &c., vs. Meekins, 50 Md. 28, 39, the Court says: "In construing acts of assembly in the light of the Constitution, every reasonable intendment must be made to enable both to stand, and an act will not be held to be unconstitutional unless it is in such plain conflict with some provision of the Constitution as to leave no discretion to the Court in the premises." It would, perhaps, be sufficient for one here to say that "the title of the act in this case would not seem to be less clear and certain in the description of the subject of the act than the titles to the acts" referred to in State vs. Norris, and in many other cases from the time of the decision in Davis vs. State, 7 Md. 151, down to the present time; and that the reasoning of the Court in those cases would establish the consti-

tutionality of the act in this. But it is suggested that the act in this case may come within the reasoning of the Court in Stiefel vs. Trustees of the Blind Asylum, 61 Md. 144. The ground of that decision, as I read it, was that as the legislature had by the title *expressly limited its proposed action to a repeal*, no affirmative action could be permitted.

Judge Cooley, in his work on Constitutional Limitations (Star page 144), in speaking of the particularity required in stating the object of an act under constitutional provisions similar to our own, says: "The general purpose of these provisions is accomplished when a law has but one general object, which is fairly indicated by its title." And see Carter Co. vs. Sinton, 120 U. S. 517, where the Supreme Court quotes with approval the language of the Court of Appeals of Kentucky in Phillips vs. Covington, &c., Bridge Co., 2 Metc. 221, as follows: "None of the provisions of a statute should be regarded as unconstitutional when they all relate directly or indirectly to the same subject, have a natural connection, and are not foreign to the subject expressed in its title."

It is indeed true that "As the legislature may make the title to an act as restrictive as they please, it is obvious that they may sometimes so frame it as to preclude many matters being included in the act which might with entire propriety have been embraced in one enactment with the matters indicated by the title but which must now be excluded, because the title has been made unnecessarily restrictive" (Cooley's Const. Lim. Star page 149). But this is because it is a "conclusive index of the legislative intent;" and I think that "conclusive index" was the ground of the decision in Stiefel vs. Trustees of the Blind Asylum (61 Md. 145). In that case the act under construction was entitled "An act to repeal an act," &c. The first section repealed the act and the second section enacted a new law in its stead. Says Judge Stone, in delivering the opinion of the Court: "Read by its title alone the bill declares that *nothing* was to be done except the repeal of the Act of 1872, but the second section does attempt something more than the repeal of the Act of 1872. It goes on to enact a new law, the subject of which the title *does not in any way indicate*."

And further on, says the Court: "No case has yet been brought before the Court, until the present, where *affirmative* legislation was attempted under a title which disclosed *absolutely nothing* except the repeal of a former act." In the act now under discussion the title shows an intention to add sub-sections to a certain section of a former act. The legislature showed no intention to limit its actions as to what those subsections should contain. There was no positive legislative intent shown to limit action to what may be called *affirmative action*, and having by the title called attention to the subject matter, it was further necessary that only "one subject," as that expression has been construed in this State, should be included. Since the case of Stiefel vs. Trustees, &c., the Court of Appeals has continued to give the same liberal construction to this constitutional provision as had been previously given (Slymer vs. State, 62 Md. 237; State vs. Norris, supra). More than this, however, the only objection to the title of this act that can be made, is that it does not specify an intention to repeal the former act. But is it necessary that it should have done so? The principle of the objection would be that no repealing action should be allowed to be proper because the act has an affirmative title. In Cooley's Const. Lim. Star page 145, we find the following language: "The repeal of a statute on a given subject, it is held, is properly connected with the subject matter of a new statute on the same subject, and therefore a repealing section in a new statute is valid, notwithstanding the title is silent on that subject." The doctrine laid down by Judge Cooley is sustained by our Court of Appeals in County Commissioners vs. Franklin R. R. Co., 34 Md. 159, where the Court held that an act entitled "An act to provide for the general valuation and assessment of property in this State" was sufficiently comprehensive in description to include a repealing clause, repealing "all laws exempting property from valuation," the Court stating that the objection on that ground was fully answered by the construction given to the constitutional provision in cases theretofore decided in this State.

I think, therefore, taking into consideration the principles upon which the Court of Appeals has acted in

cases of this character, and paying due respect to the language used by that Court, I am compelled to decide that the repealing Act of 1888 is constitutional.

If then this statute is constitutional, and the Baltimore and Ohio Employes' Relief Association was dissolved on the 1st day of April, 1889, what would be the duty of this Court, provided nothing else appeared to have been done in relation to the winding up of its affairs and the distribution of its assets?

The effect of such a dissolution at common law was that the real estate of the corporation reverted to the grantor and his heirs, its goods and chattels went to the crown and the debts due to and from it became extinguished. All suits brought by and against such corporation abated. No regard was had for any rights of members or shareholders; in fact such members or shareholders had no rights in or to the assets.

Angell and Ames on Corps., Sec. 779, and 2 Waterman on Corps., Sec. 434.

"But this harsh rule is now obsolete, and the Courts of equity, on the dissolution of a corporation, will take charge of its assets and apply them to distribution among the shareholders;" and this the Courts will do on the principle that equity will look upon the property to be administered for the benefit of the shareholders (1 Lawson Rights, Remedies and Practice, Sec. 507; Bacon vs. Robertson, 18 Howard 486; 2 Morawetz on Corps., Sec. 1033, and cases cited).

Without then at present taking into consideration the effect of certain transactions which it is claimed would change the result so far as action by this Court is concerned, the plaintiff, having been a member in good standing of the corporation up to the hour of its dissolution, would have the right to come into Court and insist upon the appointment for a receiver, unless under our law the committee of management had taken possession of the assets as "trustees of the creditors and stockholders of the corporation dissolved." (Code, Art. 23, Sec. 272) and were proceeding to settle its affairs; which state of circumstances is contradicted by the record in this case.

Such an officer would be the proper, and perhaps, the only proper person to institute suits on behalf of the association and to gather its property and assets. (High on Receivers, Sec. 320; Osgood vs. Layton, 3 Keys (N. Y.) 523.) This position is further strengthened by the language of our own statute, where after providing in previous sections for the dissolution of corporations and the administration of their assets, in Sec. 274, Art. 23 of the Code, it is provided that only a receiver, appointed before or after dissolution, shall bring new suits on behalf of a dissolved corporation. And if it should appear from the proceedings that litigation must in all probability ensue; I think the Court should, in order to protect all rights and interests, take jurisdiction of the affairs of such corporation upon the demand of any one beneficially interested and appoint its receiver by and through whom alone its jurisdiction could be made effectual.

If I am correct in this, it becomes necessary at this point to inquire whether anything has been done in relation to the affairs of this corporation that should stay the hand of this Court and leave the plaintiff to other relief or remedy suggested by the defendants. This brings us to the decisive question in this case, namely, the question of the legality of the transfer of the assets of the relief feature of the association to the Baltimore and Ohio Railroad Company, claimed to have been made by virtue of the agreement of the 29th of March, 1889, between the said association and said railroad company. (Defendant's Exhibit B. & O. No. 2.) This agreement recites, among other things, that the Legislature at its last session repealed the charter of the association by an act to take effect April 1st, 1889; that the Baltimore and Ohio Railroad Company is the guarantor of all the obligations of the association; that the railroad company has established the relief department under regulations issued by the president of the company, "which department, through its relief, savings and pension features *is intended and fitted to carry out the purposes and continue the business of the relief, savings and building and pension features respectively of the association;*" that said regulations provide for the admission to membership in the relief feature of the association, conditioned on the transfer of the assets thereinafter provided; that it is desired to wind up the business of the several features of the association on the 31st of March,

and afford the opportunity to the members of the relief feature, &c., of the association "to retain and continue the privileges and advantages afforded them in the association by becoming members of the relief feature" in said relief department; "in consideration of the premises and agreements on the part of the company," contained in the agreement, the association agrees that it "will convey, transfer, assign and set over to the company, or any person or body corporate that the latter may designate, all the property, assets, credits and securities now held or hereafter acquired by the association for or in connection with its relief feature." The company then agrees "that the property, assets, credits and securities of the relief feature so to be conveyed shall and will be held and applied to the payment of the liabilities of the association in connection with the business of its relief feature, and thereafter for the benefit and advantage of the members of the relief feature of said relief department"; the company further agrees that in case any member of the relief feature of said association shall refuse to become a member of the like feature of the relief department, "the value of his membership and interest in said association shall be ascertained by some competent actuary, and the amount so ascertained as the value thereof shall be paid in money to said member," and also that it will keep separate from the other property of the railroad company all the property the transfer of which is provided for by the agreement.

Under this agreement and without any further formal transfer the railroad company took possession of all the property of the relief feature of the association.

This agreement of transfer is attacked on several grounds. I shall only notice those which I deem necessary, only so far as necessary for a decision of the main question in the case. The first objection and the one that presents itself at the outset, is that the agreement was *ultra vires* the committee of management, and therefore unlawful and void.

It must be noticed here that this agreement was made by the committee of management of the association without notice to the members beneficially interested in the property to be transferred. No meeting of members was called and no notice was given that such a step as the transfer or assignment of the whole property of the association was about to be made, or was even in contemplation. The transfer claimed to have been made was made under the assumption (as shown in the argument of the counsel for the defendants), that these members, so beneficially interested in the corporate or trust property (for the committee of management must be viewed as trustees in regard to said property, and the member as a *cestui que trust*) ; that these members were not a constituent part of the corporation, and therefore had no right to notice, or to a corporate meeting to consider what steps would be most conducive to the interests of the association and of its members.

This assertion or assumption struck me as an exceedingly bold one. It seemed to me that it violated the clearest principles of the law that a committee of management or board of directors should have the authority to dispose at their discretion of the assets of a corporation, which assets represented and were composed of the contributions of those who in the charter were termed *members*. I think that the very use of the word *"members"* in this connection conveyed certain recognized rights to those so termed. *Members*, as I understand the use of the term, are the individuals of whom the corporation is composed, the units which together constitute the aggregate, and had it been intended that the committee should have such power, surely such intention should have been most clearly shown.

The attempt is made to uphold this power of the committee by the peculiar nature of the charter and the terms thereof (see Laws 1882, Ch. 358). By the terms of this act certain persons "and their successors, chosen as a committee of management, and a board of trustees, in the manner hereinafter provided, shall be a corporation under the name of "Baltimore and Ohio Employes' Relief Association." The manner in which they are to be chosen is set out as follows: "The powers of relief belonging to the association shall be exercised by the committee of management, consisting of ten persons, one of whom shall be the president, or president *pro tempore* of the Baltimore and Ohio Railroad Company,

four of whom shall be appointed by the president of the Baltimore and Ohio Railroad Company, and five elected annually by the members of the association."

I am constrained to say that I cannot see anything in the manner of selecting this committee that shows any intention to give them any greater power, or power different in kind, than that usually given to such officers. The manner of selecting was evidently adopted, in order that the managers to be appointed by the president of the railroad company should have the power to prevent action on the part of the other managers that would or might be injurious to the railroad company's interests, and it was a fair and reasonable provision in view of the fact that said company was to guarantee the faithful and true performance of the obligations of the association," and was also authorized "from time to time to give such aid to said association by contributions of money or otherwise," on such conditions as might be prescribed by the president and directors; but this design to protect those interests did not imply a purpose to give to the committee such extraordinary power as is contended for by the defendants. It was done to furnish means of protection and defense, but not for the purpose of furnishing means for an attack on the rights of others. By this plan of selection the members beneficially interested were prevented from choosing more than one-half of the committee; but after the committee should be se-'ected, I fail to perceive how they were, as a committee, to constitute the corporation, without regard to those members. Many of the special acts provide that certain named persons and their successors shall constitute the corporations, but in no case before this, except in charitable or like corporations, have I ever heard of its being contended, that the board of managers or directors were alone to constitute the corporation, and that members beneficially interested were to have no inherent corporate rights as constituent parts of the corporation, and certainly no cases to that effect have been cited before me.

In 1 Morawetz on Corps., Sec. 34, it is stated that "under some charters a board of directors or trustee is constituted a body corporate by law, while the shareholders are the parties directly interested in the corporate estate. A corporation of this description differs from an ordinary corporation only in form. The shareholders are practically and in reality the corporate association, and the directors or trustees are the agents of the association. It is only in dealing with the technical rules relating to legal procedure and the title to property that the trustees or directors are to be regarded as themselves constituting the corporation." The author then proceeds to show the difference between charitable corporations and the ordinary business corporations in this respect, the charitable corporation being merely agent or trustee for the administration of the trust fund, and "the beneficiaries of the trust are the donees of the charity and not members of the corporation." And in Section 33, in speaking of similar provisions in general incorporation laws, he says: "The fact that the statute expressly declares that the signers of the certificate and their successors shall be a body corporate, can make no difference. The statute does not intend that they shall be a corporation, except in name. Mere names do not alter facts, and no amount of legislation can make a reality out of a fiction."

I am convinced that unless there is some other provision of the act giving this extraordinary power to the committee of management, or expressly denying corporate rights and privileges to the members, there is nothing on which to base such a claim. My attention has not been called to any provisions of this charter, and I have been unable to find such, and I am led to conclude that the members of this association had all of those rights that are inherent, under our law, in members or shareholders of kindred associations. This being so, had the members of the association a right to notice, a right to be present at a corporate meeting to discuss and vote on such a course of procedure as might be to the best interests of the association, and to decide whether or not it would be to their advantage to transfer their property for the purpose of winding up, or to wait the prescribed hour of dissolution and then have the association wound up under the provisions of the law; or was the agreement of transfer an act coming under the ordinary

duties and powers of a board of directors?

In Abbot vs. American Hard Rubber Co., 33 Barb. 578, 591, the Court says: "Boards of directors are agents of the corporation to manage its affairs and carry out the purpose and object of its formation. They are only authorized to do such things as are directly or impliedly directed or authorized by the charter. The minority in a corporation are only bound by the acts of the majority when acting under the charter and the corporators are only bound by the acts of the trustees and managers, when their acts are conformable to the organic law of the corporation, its articles or charters. *An act which to all intents terminates the corporation by taking from it its power to fulfil the purposes of its organization is not consistent with the purpose of its constitution.*" (And see Bedford R. R. Co. vs. Bowser, 48 Pa. St. 37.) In 1 Morawetz on Corps., Sec. 512, the general authority of directors is thus defined: "The general authority of directors of a corporation extends merely to the supervision and management of the company's ordinary or regular business. Nor can they wind up the business of the corporation, nor sell any property which is necessary in order to carry on its business. Directors are only agents, and they are appointed for the purpose of managing the business in which the shareholders have agreed to unite; the value of the business as a commercial speculation and advisibility of continuing it are matters which concern those who have embarked in it, and not their managing agents."

The making of this agreement by the Committee of Management can hardly be said to be an act which extended "merely to the supervision and management of the company's ordinary or regular business;" it was rather "an act which to all intents terminated the corporation by taking from its power to fulfil the purposes of its organization."

But it is said that only a day or two would have elapsed before the repealing statute would have taken effect and the railroad company had declined to further guarantee the obligations of the association, and under these circumstances the agreement of transfer should be sustained; and the defendants submitted certain authorities bearing on this point, namely: Buford vs. Keokuk Line Packet Company, 3 Mo. App. 393; Black vs. Delaware, &c., Canal Co., 22 N. J. Eq. 130; 24 N. J. Eq. 455, and Treadwell vs. Salisbury Mfg. Co., 7 Gray 393, and others. These authorities were submitted under the assumption that the act of the committee of management had the same validity and effect that it would have had had it been properly authorized and directed by the members in such a way as to bind the association, and have no applicability to the question of the power of the managing committee to execute the agreement of transfer, without such authority. They all, I think, without exception, sustain the position that to hold binding any such radical change as is attempted by the agreement of transfer in this case, a vote of the majority of the members would be required. As said by the Court in Black vs. Delaware, &c., Canal Co., 22 N. J. Eq. 130, 407, "such a radical change as the abandonment of business cannot generally be effected by directors; their duty in most charters is to manage and conduct its business. It requires the action of the corporators themselves." And in Treadwell vs. Salisbury Mfg. Co., 7 Gray 393, 404, the Court says: "Upon the facts found in the case before us, we see no reason to doubt that the vote of the majority of the stockholders for the sale of the corporate property and the closing of the business of the corporation was justified by the condition of affairs."

What, then, was the duty of the committee of management after the passage of the act repealing the charter? I think it follows from the authorities and from all principle applicable to such a case, that it was their duty to have consulted the members in a legal method if in their opinion a crisis had arisen in the affairs of the association, that a time had arrived when it was expedient to wind up its affairs, and that it would be more beneficial to so wind them up in the manner suggested by them, rather than in some other manner prescribed by law. The agreement of transfer was not, as has been shown, such an ordinary transaction as was within the general powers of the committee; it was an extraordinary transaction, one that could not have been anticipated by members when joining the association, and in re-

gàrd to which, therefore, I can have no doubt, they had the right to be consulted before action should be taken.

In a case in many respects similar to the one before the Court, Stamm vs. Northwestern Mutual, &c., Association, 65 Mich. 317, 328, the Court uses the following language: "We have here, then, the case of a corporation which circumstances have rendered it impossible to continue to carry on its business successfully or to attain the object for which it was formed. It has a large fund in its hands which cannot be applied or used to carry out the original intent for which it was accumulated, and it would appear to be the obvious duty of the managing agents under the circumstances, to wind up the affairs of the concern voluntarily under the statute; and if they neglect to do so, any one interested in the fund may seek relief in a Court of equity to obtain a distribution among the members to whom it belongs."

It is to be borne in mind that I am proceeding on the supposition that a majority of the members at a corporate meeting could themselves have legally directed the execution of this agreement of transfer so as to bind the corporation. It was earnestly and forcibly insisted that even if an agreement of this character had been authorized by such a majority, it would still have been *ultra vires;* this is a question, however, which for my view of the case, it is unnecessary to decide. Taking it then for granted that the agreement of transfer would have been valid, if directed to be made by a majority at a properly convened meeting, it would clearly seem to have been the duty of the committee of management to have submitted it to such a meeting before proceeding to deliver possession of the property of the association by virtue of said agreement. At all events, it was their duty, under the circumstances, to have called a meeting under Sec. 265, Art. 23 of the Code, which section would seem to meet the necessities of such a case. The members would then have had the opportunity for a full discussion and could have proceeded as directed by that section' and the two following sections; or they could, *perhaps*, have directed the execution of the transfer under the agreement, or they could have decided to await the hour of dissolution and then have had the affairs of the association

settled under Sec. 272, Art. 23 of the Code.

It is urged, however, by the defendants that there was no provision either in the act of incorporation, or the by-laws, for such a meeting of members as is suggested, and that in consequence of the large membership and the character of the employment of the members it was utterly impracticable to get such a meeting together. In answer to that I would say, that the committee seems by the charter to have had power to provide the proper by-laws to meet the contingency; but even if they could not have done this, I cannot see that it would have justified them in proceeding in an irregular and unlawful manner. They could have awaited the date of the dissolution, and their association's affairs could have been wound up under the law. At all events, they had nearly a year within which to advise with the members, and if they did not do so, the rights of the members should not be affected. As far as appears they waited until three days before the date of dissolution and they then executed this agreement of transfer. It does not appear that proper by-laws could not during the year after the passage of the act and the date on which it was to take effect have been passed by which the rights of all parties could have been saved; and it would be hardly permissible where the validity of such an agreement is attacked by one beneficially interested. who took no part in the execution of the same, to contend that it should be sustained on the ground that the party who'se want of power is questioned did not perfect his power, although he might have done so, had he performed his duty. This reasoning might have force if this was substantially a contest between two parties in interest. both of whom had been parties to the agreement; but cannot be applied to such a case as this, where the dissenting member was no party to the agreement. The right of even a minority to have a meeting convened in order that a vote can be taken for or against any radical change in the corporate affairs, is a valuable one, and one of which they cannot be deprived even by the arbitrary will of the majority; (2 Waterman on Corps., Sec. 420) and it would be difficult to perceive how they could be deprived of it by the ar-

bitrary will of a committee of management or board of directors. As the members had the right to be called together to consult as to the course to be adopted, the fact that the manner of giving them notice was not prescribed in charter or by-law, cannot affect that right. "If no method of giving notice is provided by the charter or by-law, personal notice must be given," and if no length of time is prescribed, a reasonable time only is required. (1 Lawson Rights, Remedies and Practice, Sec. 476; 1 Morawetz on Corps., Sec. 481; Wiggin vs. Free Will Baptist Ch., 8 Metc. 301, 312.)

I am clearly of the opinion, then, that the agreement of transfer made by the committee of management to the Baltimore and Ohio R. R. Co. was unlawful, in the sense in which that word is used in relation to *ultra vires* acts of corporations, or of boards of directors. (The People vs. The Chicago, &c., Trust Co., 7 Railway Corp. Journal, 27), and being unlawful, it seems to necessarily follow that no right to the possession of the property of the association vested in said railroad company; and in thus holding, it would, under the state of facts revealed in these proceedings also necessarily follow that the committee of management, having unlawfully attempted to convey away the assets, and having renounced all obligation to further perform any duties in relation to the property of the association by an adjournment *sine die,* the plain duty devolves upon this Court to take possession of this property by its receiver, and to see to its proper distribution through such officer.

It is here urged, however, on the part of the defendants, that the appointment of a receiver cannot be claimed as a matter of right, but is within the discretion of the Court, and that the Court will not appoint a receiver where such action is not necessary; that here the railroad company has come into this Court, has admitted that the agreement of transfer created a trust and has asked the Court to assume juridiction over the trust, and that by so submitting to the jurisdiction, all parties interested can be brought before the Court and their rights fully protected.

In regard to the discretion of the Court in relation to the appointment of a receiver, it is not necessary to cite authority to show, that this is what is termed a "sound discretion," which means a discretion controlled by principle and precedent in the same manner as the Court is controlled in the decision of most other questions that come before it; the "discretion"—as commonly understood—being in fact changed and lost in the construction given to the word "sound." It is a discretion governed and controlled by the principles of equity, and it would be difficult on those principles to sustain the proposition that, where there is a large fund belonging to a defunct corporation, or in fact to any corporation or partnership, in the unlawful possession of a third party, in which a member or partner is beneficially interested, the Court should refuse, on the application of such partner or member, to appoint its receiver to take possession of such fund or to take such action as the Court should direct in regard to the same, provided such character of relief were otherwise appropriate and proper. Any other course would, it seems to me under the circumstances of this case, place the Court in the false position of attempting to carry out and enforce an unlawful agreement against the protest of those beneficially interested, who claim that their rights have been violated in the very making of the agreement itself. How can this Court, on any principle take jurisdiction of this unlawful agreement, declare it a trust, and enforce and carry out its provisions? In the absence of express stipulation, the dissenting member would have the same rights and be entitled to the same relief, as a partner would be entitled to under similar circumstances. (McVicker vs. Ross, 55 Barb. 247, 248; Kean vs. Johnson, 1 Stockton Ch. [9 N. J. Eq.] 401, 408.) And what those rights are we find laid down in Whitman vs. Robinson, 21 Md. 30, 42; Law vs. Ford, 2 Paige 310, 2 Lindley on Partnership, Star page 555. It is laid down by Lindley that in the absence of a special agreement to the contrary, the right of each partner on a dissolution is to have the partnership property *converted into money by a sale,* even although a sale may not be necessary for the payment of debts. Dissenting stockholders have the same right. (McVicker vs. Ross, 55 Barb. 247, 248; Frothingham, Admr., vs. Barney, 6 Hunt. 366, 372, 373; Taylor vs. Earle, 8 Hun. 3).

Can anyone, then, who has unlawfully—so far as the rights of a complaining partner are concerned—obtained possession of partnership property, come into Court in answer to a bill asking for a receiver, and *where the appointment of a receiver would be the appropriate relief*, and by admitting that, notwithstanding the unlawfulness of his possession, the fund so in his possession was a trust fund, have the right to demand that the Court should administer such trust and so deprive the complaining partner of the remedy and relief the law allows him, and imposes upon him a remedy he neither asks or desires, but on the contrary, protests against?

The mere statement of such a proposition carries with it a negative answer. Still this, it seems to me, is what is demanded by the defendants in this case. I cannot see how it is possible for a trust to be so created by an invalid, unlawful deed as to lead to its enforcement by a Court of equity against the protests of an unwilling *cestui que trust.*

Independently, however, of these, in my opinion, convincing considerations, there are certain features of the agreement of transfer, which in themselves, should have the effect of causing a Court of equity to hesitate long before it would undertake to administer it as a trust and enforce its provisions. What do we find from the recitals of this agreement to have been the primary and inducing object of its execution? After reciting that the legislature had repealed the charter of the association, &c., it is further set out that the railroad company has established its relief department under regulations issued by its president, "which department through its relief, savings and pension features *is intended and fitted to carry out the purposes and continue the business of the relief, savings fund and building and pension features, respectively, of the association.*" And further on it is recited that it is desired to wind up the business of the several features of the association on the 31st instant, and to afford to the members of the relief feature, &c., the opportunity "to retain and continue the privileges and advantages afforded them respectively in the association by becoming members of the relief feature, &c., in said relief department."

Does this suggest such a *bona fide* winding up of the affairs of the corporation as the law requires, and would induce a Court of equity to administer it as a trust? Does it not rather show an intention "to carry out the purposes and continue the business" of the association through another corporation? It is true that towards the end of the agreement a provision is found for ascertaining a provision value of the membership and interest of dissenting members, but this seems to have been added as an afterthought and not to have been one of the primary objects in view. And aside from the apparently untenable proposition, necessarily implied, that these contracting parties had the authority to prescribe how the value of these interests should be ascertained, and without considering the same; I think any fair-minded man would be forced to the conclusion that the primary and real object of that agreement was not to wind up the business of the association in any mode known to the law, but to transfer it bodily to another corporation. In Cook on Stocks, Stockholders and Corporations, Sec. 607, this subject is considered by the author, and after stating that the old common law doctrine, that a majority of the stockholders may at any time effect a voluntary dissolution of the corporation, is still sustained, continues as follows: "But if the purpose of such dissolution" (the author from the context, evidently means a *sale* for the purpose of dissolution) is not a *bona fide discontinuance of the business, but is the continuance of that business by another new corporation,* then the better and later rule is that a dissenting stockholder may prevent the sale, even though it is made with a view to the dissolution of the corporation. This is the law as laid down by the well considered case of Kean vs. Johnson (9 N. J. Eq. 401); such a dissolution is practically a fraud on the law. It seeks to do indirectly what cannot legally be done directly." (See Kean vs. Johnson, 9 N. J. Eq. 401, 408, &c.) I take it that this can only mean that the sale or other transfer must be made in the interest of the members for the primary purpose of liquidation and dissolution, and that if from the terms of the instrument of transfer or sale, or from other evidence it should appear that the pri-

mary object was not a *bona fide* discontinuance of the business, but the continuance of the business through another corporation (although incidentally it should lead to dissolution) the sale or transfer would be set aside; for if a sale would be enjoined, it would generally, unless other equitable rights have been intervened, be set aside. If this be the law, the execution of this agreement of transfer, in the language of the Court in Frothingham vs. Barney, 6 Hun. 366, 373, "was simply an attempt to perpetuate the interests and advantages of the old company in a new one, and to accomplish such purpose by means which the law will not permit."

I have now considered those questions, raised in the argument, that I deem decisive in this case. There have been many reasons urged against a receivership that have led me earnestly to attempt to discover some method by which the rights of the dissenting members could be saved, without having recourse to a receiver. Chief among those reasons is the fact that so large a majority of the members have individually acquiesced in the transfer; but I have been unable to satisfy myself that those rights could be protected in any other legal manner. As said by Chancellor Walworth in Ward vs. Sea Ins. Co., 7 Paige 294, 299 (after expressing his conviction that some arrangement should be made for closing the affairs of the company as suggested by four-fifths of the stockholders). "The counsel for the petitioners, however, insist upon a decision on this application, and I have no authority to make any order in the case which is not authorized by the strict rules of law."

According to my views of the law as applicable to this case, no other course is open to me than that of appointing a receiver.

I will sign the order for the receiver in the case of Cannon vs. Baltimore and Ohio Employe's Relief Association and others, as the proceedings in that case present more satisfactorily the points that I have decided. I will however receive an application for the consolidation of that case and the case of Conley vs. same defendants, which was argued at the same time as Cannon's case.

I will add in reference to the parties, that at my suggestion, by amendment,

the members of the committee of management were made defendants. This suggestion was made in accordance with the views expressed by the New York Court of Appeals in the People vs. O'Brien, 111 N. Y. 1.

The motion was heard before the coming in of the answers of these defendants, by consent of the defendants' counsel, who stated that said members of the committee would adopt as their answers, the answers already in, and would be represented by the same counsel as the other defendants.

Of course the order will only have reference to the property of the relief feature of the association, as the plaintiff has shown no interest in the other assets of the association.