# WILLIAM H. DAVIS *vs.* THE STATE.

The provision in the 17th section of the 3rd article of the constitution, that "no law shall be revived, amended or repealed by reference to its title or section only," was inserted to prevent incautious and fraudulent legislation; to enable members to act knowingly on all subjects, and to guard them from the contingency of voting for the repeal or revival of laws through mistake or accident, under the deceptive language often employed in the title of acts.

But this provision does not apply to an independent act establishing a new or reversing some previous policy of the State; in such a case, the enactment of one law is as much a repeal of all inconsistent laws as if the latter were repealed by express words.

The provision, in the same section of the constitution, that "every law enacted by the legislature shall embrace but one subject, and that shall be described by the title," was intended to prevent grafting upon subjects of great public benefit and importance foreign and pernicious matters for local or selfish purposes.

The act of 1854, ch. 200, entitled, "An act to regulate inspections in the city of Baltimore," relates to inspections and to such other matters only as are inseparably connected therewith, and therefore embraces but a *single subject,* which is sufficiently described by its title.

A whole law, otherwise constitutional, would not be rendered void by the introduction of a single foreign or irrelevant subject not indicated in the title; in such case, the irrelevant matter would be rejected as void and the principal subject of the law, if properly described in the title, would be valid.

But where an act is composed of a number of discordant and dissimilar subjects, so that no one can be clearly recognised as the controlling or principal one, the whole law is void.

The 11th section of the 2nd article of the constitution gives to the governor the power to fill all offices in the State, whether created by the constitution or by act of Assembly, unless otherwise provided by the one or the other.

When the legislature creates an office by act of Assembly, it can designate by whom and in what manner the person who is to fill the office shall be

appointed; and if it is silent on this subject, the governor makes the appointment, the same as if he were specially authorised by the act to do so.

Where an office is of legislative creation, the legislature can modify, control or abolish it; and within these powers is embraced the right to change the mode of appointment to the office.

The act of 1821, ch. 77, created the office of inspector of bark and gave the governor the power to appoint the officer, and as the legislature has the power to withdraw the authority to appoint from the governor, the mode provided by the act of 1854, ch. 200, by which inspectors under that act are to be designated and qualified, is a constitutional exercise of legislative power.

Whether the act of 1854, ch. 200, abolishes the office of inspector of bark as it formerly existed or not, it nevertheless requires the inspector who may be appointed by the governor to take out a license as any other person.

The Circuit Court for Baltimore city has concurrent jurisdiction with the Superior Court in all cases in equity, and generally such jurisdiction as the chancellor had in regard to the fifth judicial circuit, and this is ample enough to warrant the issuing of writs of error.

ERROR to the Criminal Court of Baltimore city.

By the act of 1821, ch. 77, entitled, "An act to provide for the inspection of ground black-oak bark intended for exportation," it is provided, that no such bark "shall be exported from the port of Baltimore until the same shall be inspected by a person to be appointed annually by the governor and council." The act then specifies particularly the manner in which this officer was to perform his duties, and what fees he was to receive; and the 7th section imposes a penalty upon any person who shall ship from any other port in the State, than Baltimore, "any bark not inspected as directed by this law." By the act of 1853, ch. 100, this officer was required to inspect all such bark "for sale in the city of Baltimore, or for exportation therefrom."

The act of 1854, ch. 200, entitled, "*An act to regulate inspections in the city of Baltimore,*" provides, by its *first section*, "that from and after the first day of May" 1854, when the act was to go into effect, "any free white citizen of the State," on application to the clerk of the Court of Common Pleas in the city of Baltimore, and paying the sums thereinafter named, "shall be entitled to receive a license to act as inspector of the articles mentioned in the license." The sums

Davis *vs.* The State.

to be paid for licenses to act as inspectors of various articles are then fixed, and among these, "for a license to act as inspector of ground black oak bark, one hundred dollars;" it then provides, that "no license shall authorise any inspector to act as such out of the limits of the city in which the same may have been granted; and any person licensed to act as inspector in said city, and who shall act as such in any city or county in which he has no license," shall be subject to the penalties hereinafter "provided for the punishment of persons acting as inspectors without license." The *second section* enacts, "that any person not having a license to act as such inspector, who shall act as inspector of any of the articles named in the first section of this act," shall forfeit a sum double the price of his license, "to be imposed as a fine by the court having criminal jurisdiction in the city on presentment or indictment and conviction." The *third section* provides, that any person may buy or sell or export any of the articles mentioned in the first section "without having the same inspected, measured or guaged by any inspector; but in all cases of difference between the buyer and seller as to the quantity, quality or measurement of any of the said articles, either party may call in any inspector of the article authorised to act in the city where the article may be situated, and the judgment of the inspector shall bind the parties." The *fourth section* provides, "that the fees for inspections shall be the same as those now fixed by law," and "that before any person shall act as inspector under the provisions of this act," he shall take an oath "faithfully to discharge the duties of said office," to be administered to him by the clerk granting his license. The provisions of the other sections of this law are not material to the present case.

At the time this last law was passed, the plaintiff in error was the inspector of ground black oak bark, duly commissioned to act as such; and after the expiration of his then term of office, which expired on the first Monday of May 1854, he was reappointed by the governor and a new commission issued to him, under which he duly qualified and continued to act under the old law, by virtue of his commission, without taking out a license. For so acting, he was indicted at May term

20      v.7

1854 of the Criminal Court of Baltimore city, and to this indictment he filed a general demurrer for the purpose of testing the validity and constitutionality of the new law. This demurrer the court, (STUMP, J.,) overruled, and gave judgment in favor of the State for the penalty of $200. To correct this judgment, a writ of error was sued out from the Circuit Court for Baltimore city.

The cause was argued before LE GRAND, C. J., TUCK and MASON, J.

*Daniel M. Thomas* and *Cornelius McLean* for the plaintiff in error, argued:

1st. That the writ of error in this case was properly issued from the Circuit Court for Baltimore city. (On this point the counsel for the plaintiff in error were stopped by the court, who said they did not desire to hear any thing further upon that subject, as it had been fully discussed in the preceding case of *Manly vs. The State.*)

2nd. As to the points arising upon the writ of error, they contended that the judgment below ought to be reversed:

1st. Because the old laws creating the office of inspector of ground black oak bark are not *expressly repealed* by the law of 1854, as there is no repealing clause in that law; and there can be no repeal by *implication* under the new constitution, art. 3, sec. 17, and therefore the law of 1854 can only stand in so far as it is not inconsistent with previous laws on the same subject. 9 *Law Lib.*, 31. 4 *G. & J.*, 152, *Canal Co. vs. Railroad Co.* The powers of the inspector appointed by the governor under the old law extended all over the State, whilst the act of 1854 applies only to the city of Baltimore. Because the office of inspector of ground black oak bark, under the title of this law, can only be *regulated* and *modified*, and not *abolished*, as the constitution, (art. 3, sec. 17,) requires the subject matter of every law to be correctly described in the title. 15 *Barbour*, 657, *Mosier vs. Hilton.* And because the act of 1854 did not *intend* to *abolish* the old office, since

by the title the design appears to have been merely to *regulate* it; since the *fees* and duties of office are left the same as under the old system; since the persons authorized by it to act under licenses are called by the old name of office; and since it does not in fact destroy the *character* of the office, inasmuch as, notwithstanding the third section of the law, inspections are still to some extent compulsory, and independent of the consent of individuals; and the inspector's brand, when imposed, is an index of the value of the article, in the truth or falsity of which the public is interested. These are all duties concerning the public and pertaining to a public officer. 2 *Cowen,* 26, *Seymour vs. Ellison.* 7 *Bac. Abr.,* 279, 280. 2 *Hill,* 196, *People vs. Bedell.* 20 *Wend.,* 596, 598, *People vs. The Comptroller.*

2nd. Because if the old office be not abolished, the governor alone has the right to appoint the officers, under art. 2, sec. 11, of the new constitution, which gives him the appointment of all civil officers whose election or appointment is not otherwise provided for, "*unless a different mode of appointment be prescribed in the law creating the office,*" and the legislature, by attempting to interfere with that right, step beyond the limits assigned them by the constitution, and encroach upon the executive branch of the government. 2 *Denio,* 272, *Warner vs. The People.* 9 *G. & J.,* 410, *University of Maryland vs. Williams.* 1 *G. & J.,* 463, *Crane vs. Meginnis.* 6 *Barr.,* 511, *Parker vs. The Commonwealth.*

3rd. Because even if the law does abolish the old office and create a new one, yet the authority thereby given to all persons to discharge the duties of the same on paying for and obtaining a license, is not a "mode of appointment," as the term appointment implies a *selection* based upon an exercise of judgment, nothing of which is involved in the *buying* a license. And therefore the governor only could appoint to the new office, as no mode of *appointment,* according to the correct definition of that word, is pointed out in the law creating it.

4th. Because the license system sought to be established

by the law of 1854, is against the spirit of the constitution, as it authorizes persons to exercise public functions without prescribing for those persons any qualifications of skill or integrity, but only the bare qualification of ability to pay the costs of the license, and is against public policy, in putting public offices up for sale, and in not limiting the number of the officers, which leads to competition and corruption.    7 *Bac. Abr.*, 279, 296, 311.

5th. Because if the license system be bad, all the rest of the law of 1854 must fall with it, as having been based entirely upon it, and intended only to apply to it.    Therefore the appointees of the governor need not pay the license fee, and cannot be affected by the third section, which makes inspections to some extent voluntary.

6th. Because at any rate the commissioned officer may act concurrently with the licensed ones, as the right of appointment has not been taken away from the governor, and he will be entitled to act without paying the license fee, which would amount to a double tax, as his commission is already taxed under the act of 1847, ch. 54.    The conclusions insisted upon are, that the whole law of 1854 is bad and the old laws remain unchanged.    Or that Davis can act under his commission without a license, and to the exclusion of the licensed officers, but cannot compel parties to have their bark inspected.    Or, at any rate, that he can act under his commission concurrently with the licensed inspectors and without a license.

*Charles J. M. Gwinn,* State's Attorney for Baltimore city, and *Frederick W. Brune,* for the State, argued:

1st. That the writ of error should be quashed, because the Circuit Court for Baltimore city had no power to issue it. (Their argument on this point was the same as that in the preceding case of *Manly vs. The State.*)

2nd. As to the points arising on the writ of error, they contended:

1st. That the act of 1821, ch. 77, creating the office of inspector of ground black oak bark, made the inspection of this material, by a person appointed by the governor, obligatory.

2nd. That the legislature had an undoubted right to declare afterwards that said inspection should not be obligatory, and that this declaration was made by the act of 1854, ch. 200.

3rd. That the act of 1854, ch. 200, was not unconstitutional, because it did not repeal the act of 1821 in so many words. If it had undertaken to repeal the act of 1821 by reference to its title, it might have been in contravention to art. 3, sec. 17, of the constitution. But the constitution does not affect the common law principle, that a statute may be constructively repealed by the passage of a subsequent statute which is inconsistent with its provisions, or which dispenses in terms with its requirements. 3 *Gill*, 154, *Dugan vs. Gittings*. 20 *Pick.*, 410, *Goddard vs. Boston*. 21 *Do.*, 376, *Commonwealth vs. Kimball*. The party who assails an act of the legislature upon the ground of its unconstitutionality, must make out a clear case of legislative usurpation. 9 *Gill*, 305, *Baugher vs. Nelson.*

4th. That where the existence of an office is created by a statute which makes submission to the authority of such officer imperative, it may well be considered that his office is abolished when a subsequent statute makes it unnecessary for the public to require his services.

5th. That if the right of the governor to appoint to office under the constitution is not interfered with by the act of 1854, since the provisions of this act with relation to licensed inspectors makes them officers, holding appointments by the operation of law, when they comply with the conditions necessary to obtain office; and such a case is provided for in the constitution, because the right of the governor to appoint to office is expressly confined to cases in which a different mode of appointment is not provided for in the law.

6th. That if the office, under the act of 1821, ch. 77, was not abolished, the legislature had the right to affix any new conditions to an office created by a former act of the legislature, and that the requirement of a license from all who undertake to inspect under the act of 1854, is, in the nature of such a condition to the exercise of the functions of an office, con-

ferred by the governor under the law of 1821, as well as upon the exercise of the occupation by a private citizen.

7th. That although the appointment of an inspector may be the best system, yet the law of 1854, which allows persons to qualify, who may act as inspectors if called upon, is not against public policy. The law provides only for a voluntary submission to the licensed inspector, of the differences between buyer and seller.

8th. The law of 1854 prescribes the conditions and terms under which these persons licensed to inspect shall act, and therefore virtually *appoints* them; it makes the appointment just as effectually as if made by the governor. The legislature, by this act, dealt with the *inspection system*; its *title* is sufficiently broad, for if there is anything in the law that regulates this system, it is legitimately within the purview of the title.

MASON, J., delivered the opinion of this court, and his own, in part, dissenting opinion.

We did not understand the counsel for the appellant as contending, that the legislature had no power to amend, modify or even repeal the act of 1821, ch. 77, creating the office of inspector of bark. We understand, that while they clearly admit the power, they insist that the legislature in passing the act of 1854, ch. 200, entitled: "An act regulating inspections in the city of Baltimore," have exercised that power in a mode not warranted by the constitution, and that therefore the law is of no avail.

Under our former constitution, there could have been no doubt, that as the act of 1854 was inconsistent with that of 1821, the last act would operate as a repeal of the former, in so far as they were repugnant to each other. It is supposed that under art. 3, sec. 17, of our new constitution, which provides, that "no law or section of law shall be revived, amended or repealed, by reference to its title or section only," there can be no repeal of a preexisting law, by the implication resulting from a subsequent inconsistent or contradictory legislative enactment. We do not so understand the new constitution.

Davis *vs.* The State.

The particular clause to which we refer, was evidently inserted in the constitution, for the purpose of preventing incautious and fraudulent legislation, and to enable members to act knowingly upon all subjects, and to guard them from the contingency of voting for the repeal or revival of laws, through mistake or accident, under the deceptive language often employed in the title of acts. Under our former system of legislation, a good or a bad provision might slumber in the body of a law, of which the title gave no intimation, and hence members of the legislature might suppose from the title of the law, that they were voting for one thing, when in fact they were unwittingly voting for another directly the opposite; at least the title afforded often little or no information, as to what was contained in the body of the law, which was its office to have done. Not so however with an independent act of the legislature, establishing a new, or reversing some previous policy of the State. The very fact of establishing a particular rule of conduct for the public, presupposes an intention on the part of the legislature, that a contrary rule should not prevail, and therefore the enactment of one law, is as much a repeal of all inconsistent laws, as if those inconsistent laws had been repealed by express words. It could never surely have been the intention of the framers of the constitution, that a positive enactment by the legislature upon a subject within their legitimate powers, was to be defeated, because a previous law, not in terms repealed, was inconsistent with it. If this strict test were required, many wholesome laws would be rendered wholly inoperative, because of the inability or neglect of members to search thoroughly the statute books for laws which might be inconsistent or repugnant; a work in many cases of so great difficulty, as to amount almost to impossibility.

The next objection urged to the validity of the act of 1854, is, that if its purpose was to create a new system of inspections, and to repeal the act of 1821, then the subject of the *law* is not sufficiently described by *its title*, as required by the 3rd article and 17th section of the constitution. The lan-

guage of the constitution is: "Every law enacted by the legislature shall embrace but one subject, and that *shall* be described by the title." We think the act of 1854, ch. 200, has sufficiently been made to conform to these requirements. The law relates to inspections, and to such other matters only as are inseparably connected with it, and to none other, and therefore can be said to embrace but a *single subject.* It could hardly be successfully urged against a law, that it does not embrace and dispose of *the whole subject* to which it relates. If it could be, few laws, if any, could stand such a test.

The object of this constitutional provision is obvious and highly commendable. A practice had crept into our system of legislation, of engrafting, upon subjects of great public benefit and importance, for local or selfish purposes, foreign and often pernicious matters, and rather than endanger the main subject, or for the purpose of securing new strength for it, members were often induced to sanction and actually vote for such provisions, which if they were offered as independent subjects, would never have received their support. In this way the people of our State, have been frequently inflicted with evil and injurious legislation. Besides, foreign matter has often been stealthily incorporated into a law, during the haste and confusion always incident upon the close of the sessions of all legislative bodies, and it has not unfrequently happened, that in this way the statute books have shown the existence of enactments, that few of the members of the legislature knew any thing of before. To remedy such and similar evils, was this provision inserted into the constitution, and we think wisely inserted.

We are not prepared to say, that a whole law, otherwise constitutional, would be rendered void by the introduction of a single foreign or irrelevant subject into it, and where such subject was not indicated in the title. In such a case the irrelevant matter would be rejected as void, while the principal subject of the law would be supported, if properly described in the title. But if an act of Assembly, be composed of a

number of discordant and dissimilar subjects, so that no one could be clearly recognised as the controlling or principal one, the whole law would be void.

The appellant, in the next place, contends, that the law of 1854 is unconstitutional and void, inasmuch as it seeks to take from the governor the appointment of the inspector; and art. 2 and sec. 11 of the constitution is relied on to support this position. That section provides, that the governor shall appoint all officers "whose appointment or election is not otherwise *herein* provided for, unless a different mode of appointment be prescribed by the law creating the office." In few words, we think this provision means, simply, that the governor shall have the power to fill all offices in the State, whether created by the constitution or by act of Assembly, unless otherwise provided by the one or the other. When, therefore, the legislature has created an office by act of Assembly, the legislature can designate by whom and in what manner the person who is to fill the office shall be appointed. If the source of appointment is not thus designated, the governor, by virtue of the above section, makes the appointment, the same as if he had been specially authorised by the act to do so. The act of 1821, ch. 77, authorises the governor to make the appointment of inspector, and the same power that conferred this authority upon the governor can take it from him. The office we are now considering is one of legislative creation; and by the legislature it can be modified, controlled or abolished, and within these general powers is embraced the right to change the mode of the appointment to the office. We have only to add, that as the legislature has the power to withdraw the authority to appoint from the governor, the mode pointed out by the act of 1854, by which inspectors under that act are to be designated and qualified, was a constitutional exercise of legislative power, and we need not say whether the inspectors under the act of 1854 are technically *officers* in point of law or not. ·

This leads us to the consideration of another question raised by the record. Conceding the act of 1854 to be in all respects constitutional, and that the mode pointed out for designating or

21    v.7

appointing the inspectors under it was legal and valid, still, is that act so far repugnant to the act of 1821, and to the other acts relating to the inspection of bark, as to operate as a total repeal of them ?

A majority of the court are of opinion, that whether the act of 1854 abolishes the office as it formerly existed or not, it nevertheless must be construed to require the inspector who might be appointed by the governor to take out a license as any other person, and in deciding this point they have said enough to dispose of the case as made by the record.

Upon this point the judge who delivers this opinion thinks differently. In the first place, there is no attempt at an express repeal, and a repeal by implication can only result from a clear, palpable conflict between the last and the previous law. The true test by which we are to ascertain whether such conflict or repugnancy exists, is, can the two laws stand together and be executed at one and the same time? By the act of 1821, no one could inspect bark but the officer appointed by the governor. This provision is clearly repealed, because by the act of 1854, any one can do so who takes out a license as directed by the act. The privilege, however, is not extended to any other than to those who take out a license, and any person who may attempt to exercise the privilege without such license is subjected to a penalty, and in this way it is supposed that the act is made, by implication, to exclude from the right to inspect the duly commissioned officers appointed by the governor under previous laws, *unless they take out a license.* I do not so construe the law of 1854. Its object simply was to permit other persons, upon certain conditions, to exercise the privilege of inspecting in common with the commissioned officers. I do not understand the act of 1854 as affixing a new condition to the exercise of the right to inspect under the act of 1821, but as merely extending the rights or privileges of that act to all private citizens who may think proper to take out a license. If, therefore, the inspectors appointed by the governor be not subject to the penalty, and I think they are not, there can be no doubt that they might, concurrently with the licensed inspectors, continue to discharge the duties of their office as

formerly, subject only to the changes and modifications made in the system by the act of 1854. Their doing so would in no way bring them in conflict with the licensed inspectors, and their powers could not therefore be said to be repugnant to each other.

By the act of 1821, chap. 77, sec. 7, it was obviously the design of the legislature to empower the inspector of bark for Baltimore city to exercise his office beyond the limits of Baltimore should occasion call for it, though perhaps he might not have been *required* to do so. So far from the act of 1854 repealing this provision, it clearly, by implication, recognises it. I cannot read the latter act without clearly discovering that the legislature contemplated that inspections were still to be made outside of the limits of Baltimore. It provides, that "no license shall authorise any inspector to act as such out of the limits of the city in which the same may have been granted;" and the act grants no authority to any one else than the clerk of the Court of Common Pleas of Baltimore to issue such license. Who then is to make inspections of bark out of Baltimore? Certainly not the inspectors created by the act of 1854, and unless they are made by the appointee of the governor, they could not be made at all. From this circumstance, so far from discovering a purpose to destroy the office as it originally stood, I find a manifest recognition of it by leaving certain duties to be discharged exclusively by its incumbent.

We do not perceive, in the act of 1854, anything so repugnant to good morals and public policy as to render it void.

The remaining question relates to the jurisdiction of the Circuit Court of the city of Baltimore to issue writs of error.

In the case of *Manly vs. The State,* decided at this term, we have said, that the Superior Court of Baltimore has the power to grant writs of error by virtue of its general equity jurisdiction conferred by the constitution. The constitution authorises the creation by the legislature of the Circuit Court, and in the exercise of that power, in the passage of the act of 1853, chap. 122, "concurrent jurisdiction with the Superior Court of Baltimore city, in all cases in equity," and generally, such cases "as have heretofore been conferred on the chan-

cellor of this State, so far as regards the fifth judicial circuit," has been given to the Circuit Court of Baltimore city. This jurisdiction is ample enough to warrant the issuing of writs of error.

*Judgment affirmed.*

Mason, J., dissenting in part.