809 A.2d 640

**DELMARVA POWER & LIGHT COMPANY**
**d/b/a Conectiv Power Delivery, et al.,**

v.

**PUBLIC SERVICE COMMISSION OF MARYLAND, et al.**

No. 75, Sept. Term, 2001.

Court of Appeals of Maryland.

Oct. 11, 2002.

Deborah E. Jennings (Brett Ingerman of Piper, Marbury, Rudnick & Wolfe, LLP), Baltimore, for Baltimore Gas and Electric Co.

Paul S. Buckley (Lee A. Satterfield, Harry S. Johnson, Dwight W. Stone, II, of Whiteford, Taylor & Preston, on brief), Baltimore, for Washington Gas Light Co.

Susan Stevens Miller, General Counsel (Brock C. Hutton, Asst. General Counsel, on brief), Baltimore, Gary R. Alexander (Chantel R. Ornstein of Alexander & Cleaver, P.A., on brief), Annapolis, Michael J. Travieso, People's Counsel (Sandra M. Guthorn, Deputy People's Counsel and Richard T. Miller, Asst. People's Counsel of Maryland Office of People's Counsel, on brief), Baltimore, for appellees.

Marta D. Harting of Piper, Marbury, Rudnick & Wolfe, LLP, Baltimore, for Chesapeake Utilities Corp.

Kenneth W. Christmas, General Counsel of Columbia Gas of Maryland, Inc., Pittsburgh, PA, Francis X. Wright of Eastwick, Rose & Wright, P.A., and Margaret Lee Norton of Norton & Johnson, LLC, Baltimore, for Columbia Gas of Maryland, Inc.

Kirk J. Emge, Paul H. Harrington, Washington, DC, William D. Shapiro of Pepco Holdings, Inc., Washington, DC, Richard D. Gary of Hunton & Williams, Richmond, VA, Ted J. Murphy, Edwin G. Kichline and Kara D. Little of Hunton & Williams, Washington, DC, for Potomac Electric Power Co.

Andrew H. Marks, Jennifer N. Waters of Crowell & Moring, LLP, Washington, DC, for BGE Home Products and Services, Inc.

William J. Murphy, Robert T. Shaffer, III of Murphy & Shaffer, Baltimore and Kathy L. Mitchell of Allegheny Energy Building, Hagerstown, for Potomac Edison Co. d/b/a Allegheny Power.

Gary R. Alexander, Chantel R. Ornstein of Alexander & Cleaver, P.A., Annapolis, for amicus curiae/respondents Mirant Mid-Atlantic, LLC.

Reargued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

## ON MOTION FOR RECONSIDERATION

WILNER, Judge.

This case began with a broad attack by several public utilities on an order entered by the Maryland Public Service Commission (PSC). Although that attack is still pressed, the case has taken a new, and most unfortunate, twist, one that calls into question an attempt by the General Assembly, following the announcement of our decision that the PSC order was ineffective because of noncompliance with certain requirements of the Maryland Administrative Procedure Act (APA), to overturn that decision by excusing that order from compliance with those requirements. We shall conclude that the legislative action runs afoul of Article III, § 29 of the Maryland Constitution and, for that reason, is itself invalid. The conclusion reached by us with respect to the PSC Order remains in effect.

### BACKGROUND

In July, 1999, the PSC commenced a "generic proceeding" to address changes occurring in the electric and gas industries and to implement certain policy directives mandated by the General Assembly through its enactment of the Electric Customer Choice and Competition Act of 1999 (the Electric Act, Maryland Code, § 7–501 to 7–517 of the Public Utilities Article (PU)) and the Natural Gas Supplier Licensing and Consumer Protection Act of 2000 (the Gas Act, PU §§ 7–601 to 7–607). The end result of that proceeding was a multi-faceted order (Order No. 76292) that placed certain requirements on the electric and gas utilities that remained subject to regulation by the PSC and imposed certain limitations on the relationships that those utilities had with their non-regulated affiliates.

In actions filed in the Circuit Court for Wicomico County, the utilities challenged that order on a number of procedural and substantive grounds. All of the utilities sought judicial review of the order under Maryland Code, § 10–222 of the

State Government Article (SG), which is part of the "contested case" provisions of the APA. In those actions, they complained that various aspects of the order were arbitrary, capricious, unsupported by the record, otherwise unconstitutional, and beyond the PSC's statutory jurisdiction. Alleging that some provisions of the order fell within the definition of a "regulation" under the APA, one of the utilities, Delmarva Power & Light Company, also sought a declaratory judgment under PU § 3–201(a) that those parts of the order were also invalid because the PSC had failed to comply with certain requirements embodied in the regulation-making provisions of the APA.

The Circuit Court rejected the argument made in the declaratory judgment action on the grounds that (1) when an order emanates from a generic proceeding, it is not necessary for the PSC to comply with the regulation-making requirements of the APA, and (2) by acquiescing and participating in the generic proceeding and not raising the issue before the PSC, Delmarva was estopped from raising the issue in a declaratory judgment action. The trial court addressed the other procedural and substantive issues raised by the utilities and, in an order entered April 25, 2001, reversed some parts of the PSC Order, remanded other parts for further consideration by the PSC, but affirmed most of the provisions. The utilities appealed and, recognizing the public importance of the issues raised, we granted *certiorari* prior to review by the Court of Special Appeals to consider the various complaints.

Prominent among the arguments made in the joint brief filed by the utilities was the challenge presented in Delmarva's declaratory judgment action—that the order indeed constituted a regulation under the APA, that the regulation-making provisions of the APA applied to the PSC, that a regulation is not effective unless there has been compliance with those provisions, that there was no compliance with respect to Order No. 76292, that the order was therefore invalid or ineffective, and that the utilities did not waive their right to raise that issue. That argument was also made, and was extensively addressed, at oral argument.

On April 8, 2002, we filed an opinion in which we concluded that Order No. 76292 constituted a regulation, as defined in SG § 10–101(g), that the PSC was subject to the requirements of the regulation-making provisions of the APA, that it had failed to comply with those requirements, that, as a result, the order was ineffective, and that the utilities had not waived their right to raise the issue in a declaratory judgment action under PU § 3–201(a). *Delmarva Power v. PSC*, 370 Md. 1, 803 A.2d 460 (2002). In particular, we held that (1) in 1978, the General Assembly specifically included the PSC under the regulation-making provisions of the APA, (2) those provisions required, among other things, that proposed regulations be published in the Maryland Register for public comment and that they be submitted to the General Assembly's Joint Committee on Administrative, Executive, and Legislative Review (AELR Committee) for its review, and (3) the statute made clear that no regulation may take effect unless and until there has been compliance with those requirements. We specifically rejected the PSC's arguments that Order No. 76292 did not constitute a regulation under the APA, that, when entering orders that emanate from a generic proceeding, it was not required to comply with the APA requirements, and that, because the utilities participated in the generic proceeding and failed to raise this issue in that proceeding, they were barred from raising it in court. The mandate at the end of the opinion was as follows:

"JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO ENTER DECLARATORY JUDGMENT UNDER PUBLIC UTILITIES ARTICLE, § 3–201 THAT DIRECTIVES CONTAINED IN ORDER NO. 76292 ARE INEFFECTIVE FOR THE REASONS STATED IN THIS OPINION; COSTS IN THIS COURT AND IN CIRCUIT COURT TO BE PAID BY PUBLIC SERVICE COMMISSION."

*Id.* at 38, 803 A.2d at 481–82.

April 8, 2002—the date our opinion was filed and placed on the Court's web site—was the last day of the 2002 regular

session of the General Assembly. Early in that 90–day session, on January 16, 2002, House Bill 135 was introduced and referred to the House Environmental Matters Committee. It had the very narrow purpose of creating a special, non-lapsing Public Service Commission and Office of the People's Counsel Fund to fund the operations of the PSC and the Office of People's Counsel (OPC).

Under the then-existing law, codified in PU § 2–110, the costs and expenses of the PSC and the OPC were funded in the normal manner, through annual appropriations from the General Assembly as part of the State Budget. Section 2–110(c) required, however, that the State Treasury be reimbursed for those appropriations through assessments made by the PSC against the various public utilities that it regulated.

In its first reader form, HB 135 repealed those parts of § 2–110 that provided for legislative appropriations to the PSC and OPC and the reversion of revenue derived from the assessments to the State Treasury. Through the enactment of a new § 2–110.1, it directed that the funds collected from the assessments go directly into the new Public Service Commission and Office of the People's Counsel Fund, which was to be non-lapsing and administered by the PSC. The Treasurer was to hold the Fund separately, invest it, and credit any earnings to the Fund. Although expenditures from the Fund were to be in accordance with the State Budget, the clear purpose of the bill was to "special fund" the PSC and OPC and give the PSC control over the revenue derived from the assessments. It would no longer be dependent on legislative appropriations but would finance its activities from the revenue credited to the special Fund.

The House Environmental Matters Committee proposed some clarifying amendments to the bill, mostly dealing with the estimated costs and expenses of the OPC, and added two additional Delegates as sponsors. Those amendments were adopted by the House of Delegates, and the bill, as so amended, was passed and sent to the Senate on March 21, where it was referred to the Senate Finance Committee.

The Senate had been working on its own version of such a bill. On February 1, 2002, SB 620 was introduced and referred to the Finance Committee. Like HB 135, it repealed those parts of PU § 2–110 calling for the PSC and OPC to be funded through the appropriation process and for the assessment revenue to be paid to the Treasury as reimbursement and created instead a non-lapsing Fund, which it called the Public Utility Regulation Fund. Apart from the difference in the name of the Fund, the Senate bill had a number of features not included in the House Bill. It added a new PU § 2–123 that would allow the PSC to charge certain additional fees for the filing of documents and other services rendered by the PSC—fees that the Department of Legislative Services estimated would amount to $125,000 per year—that would be added to the Fund, and it provided greater legislative control over expenditures from the Fund. With amendments added by the Finance Committee, SB 620 passed the Senate on March 15—six days before the House of Delegates passed HB 135.

Each House amended the other's bill to conform with its own version. The Senate amended HB 135 to conform with SB 620, and the House of Delegates amended SB 620 to conform with HB 135. Neither House was initially willing to accept the other's amendments, so, on April 4, 2002, both bills were referred to a Conference Committee consisting of three Senators and three Delegates. That was where they lay when, on the morning of April 8, our opinion was filed.

The full story of what occurred in the ensuing hours that remained in the legislative session has not been officially recorded. What *is* recorded is that the Conference Committee, which had been created solely to resolve the differences between HB 135 and SB 620 regarding the special non-lapsing Fund created by the bills, accomplished that result by largely accepting the Senate amendments to HB 135. Upon being made aware of our decision, however, the committee went further and, in an admitted effort to render that decision nugatory, added two other sections to HB 135 that had nothing whatever to do with the Fund. In a new § 2 of the bill,

the committee added a new subsection (e) to PU § 3–113, dealing with decisions and orders of the PSC, to provide:

"Notwithstanding the Administrative Procedure Act, unless a provision of this Article specifically requires the Commission to act through regulation, the Commission may implement any provision of this Article by either order or regulation as the Commission deems necessary and proper." [1]

As it reached the Conference Committee, the bill provided that it would take effect June 1, 2002. The Conference Committee retained that provision as § 4 of the bill but added, as a new § 3, a special effective date for the new § 2 it had added—that "Section 2 of this Act shall be construed to apply retroactively and shall be applied to and interpreted to affect any order issued by the Public Service Commission on or after June 1, 2000."

In order to conform the title to the bill to the Senate Amendments it had adopted, the Conference Committee rewrote the title to resemble the title to SB 620 as it read prior to the House amendments, but, to take account of the two new sections, it added to the title a new provision: "providing that under certain circumstances, the Commission may implement certain provisions of law by either order or regulation as the Commission deems necessary and proper." The title thus stated that the bill was for the purpose of establishing a Public Utility Regulation Fund and for the purpose of allowing the Commission to implement certain provisions of law by either order or regulation. It said nothing about the bill being for the purpose of increasing the efficient operation or the efficient funding of the PSC.

---

1. Notwithstanding the clear view of the PSC and OPC that this language was intended to overturn our decision and exempt the PSC from compliance with the requirements of the APA, a fair question may be raised whether the language used is sufficient to accomplish that result. To say that the PSC may act either by order or regulation does not necessarily mean that if its order constitutes a regulation under the APA, it need not comply with the requirements of that Act. We need not and do not address that issue here.

Late in the evening of April 8, the Conference Committee reported its recommendations to the two Houses. Audio tapes of the proceedings, which are found on the Legislature's web site, reveal that in neither House were the members informed about the two new sections added to the bill and that the only explanation given to them dealt with the committee's decision to conform the provisions dealing with the non-lapsing Fund to the Senate version.[2] With that limited expla-

---

**2.** The proceeding in the House of Delegates is recorded as follows:

Speaker: We have a Conference Committee Report on 135, House Bill 135.

Unknown: Mr. Speaker.

Clerk: House Bill 135 Public Service Commission Office of the People's Counsel Fund.

Unknown: Mr. Speaker.

Speaker: The Chair recognizes the chairman of the Conference Committee.

Chairman: Thank you, Mr. Speaker. Uh, House Bill, as amended House Bill 135, is conformed to Senate Bill 620. It establishes a Public Utility Regulation Fund to pay the costs and expenses of the Public Service Commission and Office of the People's Counsel. The Bill also authorizes the Commission to charge reasonable and non-discriminatory fees by regulation for the filing of documents with the Commission and for other services performed by the Commission. Move the Conference Committee Report.

Speaker: The question before the House is the adoption of the Conference Committee report. All in favor, signify by saying "aye," opposed "no." The ayes have it. House Bill 135 is on third reading and final passage. Call the roll.

Clerk: Mr. Speaker.

Speaker: Has everyone recorded their vote? Does anyone desire to change their vote or explain their vote? If not, the clerk will take the roll. There being 134 votes affirmative, none negative, House Bill 135, having received the Constitutional majority, is declared passed.

See www.mlis.state.md.us/2002rs/realaudio/hse_04082002_4ram, audio recording of Session 4, 1:10:20 through 1:11:30.

The proceeding in the Senate is recorded as follows:

Clerk: House Bill 135. Delegate Stern. Public Service Commission and Office of the People's Counsel Fund. The Chairman is Senator Teitelbaum.

Senator Teitelbaum: House Bill 135 establishes the Public Service Commission and Office of the People's Counsel Fund and requires the funds to be administered by the Commission and provided by the Fund as a non-lapsing fund. The Conference Committee met and agreed to accept the Senate amendments. The Senate amendments included the payment of, of this money into the Public Utility

nation, both Houses adopted the Conference Committee Report and passed the bill as amended by the Conference Committee. The House of Delegates passed the bill at 11:06 p.m. The Senate followed suit at 11:14 p.m. On May 16, 2002, the Governor signed the bill as 2002 Maryland Laws, chapter 494. At no point during the legislative process were there any committee hearings or other opportunity for public input on the additions to the bill; nor was the Attorney General's Office consulted.

Following enactment of Chapter 494, as so amended, and within the 30–day period allowed by Maryland Rule 8–605(a), three motions for reconsideration were filed with respect to our opinion. The first, filed jointly by the PSC and OPC, complained that we had not taken proper account of what they regarded as express statutory authority in the Electric Act and the Gas Act for the PSC to ignore the requirements of the APA when entering orders following generic proceedings. The second motion was filed by the utilities. They noted that, in striking down Order 76292 because of its noncompliance with the APA, we declined to reach the substantive complaints raised by them, and they expressed concern that, by purporting to eliminate that procedural deficiency, Chapter 494 may have left them without the ability to have those complaints, properly raised in the case, litigated. They asked that we have re-argument on those issues and that we decide them. The other parties to the case—led by Mid Atlantic Petroleum

---

Regulation Fund and the State Treasuries. Move the Conference Committee Report.

President: Any objection to the Conference Committee Report? If not, all in favor aye, opposed no, the ayes seem to have it. The Conference Committee Report is adopted. House Bill 135 is now on third reading for final passage. Any discussions? If not, the Clerk will call the roll.

Clerk: Mr. President.

President: Has everyone recorded their vote? . Any wish to change your vote? Any wish to explain their vote? If not, Madame Clerk, House Bill 135 has received the Constitutional majority and is declared passed.

See www.mlis.state.m d.us/2002rs/realaudio/sen_04082002_3.ram, audio recording of Session 3, 2:05:44 through 2:06:45.

Distributors Association and characterized collectively as The Alliance—which had generally supported the position of the PSC and OPC throughout the appellate process—filed their own motion for reconsideration in support of the joint motion filed by the PSC and OPC.

We denied the joint motion filed by the PSC and OPC and that filed by the Alliance. Although the denial was a summary one, it was premised on the fact that, in crafting our opinion, we had, indeed, considered the provisions of the Electric Act and the Gas Act alluded to by the PSC and OPC and determined that they did not authorize the PSC to ignore the clear requirements of the APA. Recognizing the merit of the utilities' concern if Chapter 494, in fact, sufficed to erase the procedural deficiency, we granted their motion and scheduled re-argument. We directed that the parties brief and be prepared to argue two additional questions, however, both going to the validity of the new sections 2 and 3 that were added to Chapter 494:

(1) Whether the addition of those sections caused Chapter 494 to violate the "single subject" requirement of Article III, § 29 of the Maryland Constitution and, for that reason, are invalid and of no effect; and

(2) Whether, under Article 8 of the Maryland Declaration of Rights, those amendments can validly apply to Order No. 76292.

### *DISCUSSION*

### *Article III, § 29*

■ Article III, § 29 of the Maryland Constitution requires, in relevant part, that "every Law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title." That clause embodies two requirements—(1) that a law may not embrace more than one subject, and (2) that the one subject it is permitted *and purports* to embrace must be described in the title. We traced the history and purposes of that provision in *Porten Sullivan Corp. v. State*, 318 Md. 387, 568 A.2d 1111 (1990),

and, although it is unnecessary to repeat all that we said there, some background is important to recall.

The provision was not part of the original Constitution of 1776. It was first inserted in the reformist Constitution adopted in 1851 and was carried over in the 1864 and 1867 Constitutions. Although there was little discussion recorded in the debates of the 1851 Convention as to its purpose, in *Davis v. State*, 7 Md. 151 (1854), decided barely three years after its adoption, this Court declared the purpose of the two-part requirement to be "obvious and highly commendable." *Id.* at 160. It was intended, we said, to deal with the practice of engrafting onto subjects of great public importance "foreign and often pernicious matters" of local or selfish purposes, thereby inducing legislators to vote for such provisions "which, if they were offered as independent subjects, would never have received their support," in order not to endanger the main objective. *Id.* With uncanny prescience, our predecessors added:

> "Besides, foreign matter has often been stealthily incorporated into a law, during the haste and confusion always incident upon the close of the sessions of all legislative bodies, and it has not unfrequently happened, that in this way the statute books have shown the existence of enactments, that few of the members of the legislature knew any thing of before. To remedy such and similar evils, was this provision inserted into the constitution, and we think wisely inserted."

*Id.* See also *Parkinson v. State*, 14 Md. 184, 193 (1859).

Although in the past century-and-a-half there have been more than 130 cases in this Court in which legislation has been challenged under that provision of the Constitution, until 1990, only twice had we found a violation of the "single subject" requirement, in part because the Governor and the General Assembly, over the years, have usually acted responsibly and in compliance with the requirements imposed by the Constitution, and also in part because of our general disposition "to give the section a liberal construction, so as not to interfere

with or impede legislative action." *Whiting–Turner Contract. Co. v. Coupard,* 304 Md. 340, 361, 499 A.2d 178, 189 (1985) (quoting *Painter v. Mattfeldt,* 119 Md. 466, 473, 87 A. 413, 416 (1913)). *See also Porten Sullivan, supra,* 318 Md. at 402, 568 A.2d at 1118.[3] More recently, we pointed out that our liberal approach, with respect to the "single subject" requirement, is intended to accommodate not only a "significant range and degree of political compromise that necessarily attends the legislative process in a healthy, robust democracy," but also the fact that "many of the issues facing the General Assembly today are far more complex than those coming before it in earlier times and that the legislation needed to address the problems underlying those issues often must be multifaceted." *Md. Classified Employees Assoc. v. State,* 346 Md. 1, 14, 694 A.2d 937, 943.

Our deference to the political nature of the legislative process and our recognition that legislation often must be comprehensive in nature were never intended to render the Constitutional requirement meaningless, however, or to treat it as merely an historical anachronism. We observed in *Porten Sullivan, supra,* 318 Md. at 399, 568 A.2d at 1116–17, that, by 1982, a "single subject" requirement appeared in 41 of the State Constitutions, and, especially when contemplating the mischief sometimes caused by its absence from the Federal Constitution, we confirm the view of our predecessors that it serves a very useful purpose and was "wisely inserted."

Both the continuing vitality and the contour of the provision have been made clear in four recent cases. In *Porten Sullivan,* the Act in question began as a simple bill to extend the life of a special transfer tax in Prince George's County. During the legislative process, the bill was amended to add a

---

**3.** As noted in *Md. Classified Employees Assoc. v. State,* 346 Md. 1, 14 n. 3, 694 A.2d 937, 943 n. 3 (1997), a close reading of those two cases— *Scharf v. Tasker,* 73 Md. 378, 21 A. 56 (1891) and *Curtis v. Mactier,* 115 Md. 386, 80 A. 1066 (1911)—indicates that, in neither of them was the challenged Act "invalidated solely because of a 'single subject' violation but more, or at least equally, because the offending provision was not mentioned in the title."

comprehensive set of "ethical" provisions that required members of the Prince George's County Council who received any money, goods, or services from an applicant for zoning or site plan approval to disclose the receipt and to disqualify themselves from voting on any such approvals. The amendments provided that revenue derived from the transfer tax could be used to fund the administration of the ethical requirements. The title to the bill was amended to read "Prince George's County Council—Ethics and Taxing Authority."

The bill, which passed as amended, was challenged on the ground that it no longer embraced a single subject that was described in its title. Seeking to sustain the bill, the State argued that the single subject of the bill was the management of public affairs in Prince George's County. The county contended that the single subject was the functions and duties of the County Council. We rejected both of those arguments, agreeing with the appellant that the tax provisions "have nothing to do with development control or ethics," that the ethics provisions "have nothing to do with taxation or revenue raising," and that it was "simple sophistry to join, as one subject, ethics and taxing authority." *Id.* at 396, 568 A.2d at 1115. The bill, we said, "does not deal, in any general way, with the County Council" but rather contained "two unrelated and disparate sets of provisions" which were "not transformed into one merely because there is authority in the Act to spend some of the tax revenues on 'funding of the public ethics provisions.'" *Id.* at 404, 568 A.2d at 1119. Although recognizing that a bill could properly deal with the general and inter-related powers, duties, and functions of a county, or with some other comprehensive unifying theme, as, for example, did the bill enacting the Uniform Commercial Code, we held that the bill in question was not of either type, as the two sets of provisions were not closely connected or dependent on one another, and there was no unifying theme.

To meet the "single subject" and "title" requirements of § 29, we said, the several sections must refer and be germane to the same subject matter, and that subject matter must be described in the title, neither of which was the case. Harking

back to the fundamental purpose of the requirement, we noted that, although it was evident from the legislative history that there was general support among the Prince George's County delegation for the extension of the transfer tax, there was no indication of the position of that delegation with respect to the ethics provisions. We added:

"We do not need to know. What is important is that the delegates from Prince George's County were put in precisely the position from which the one-subject clause was intended to protect them: the necessity 'for a legislator to acquiesce in [a possibly] undesirable bill in order to secure useful and necessary legislation'. The Governor would have been put in a similar position with respect to his veto power."

*Id.* at 409, 568 A.2d at 1121 (citation omitted).

The second case, *State v. Prince Georgians*, 329 Md. 68, 617 A.2d 586 (1993), was cut from the same cloth as *Porten Sullivan.* Our opinion in *Porten Sullivan* was filed on February 6, 1990, while the Legislature was in session. Upon the filing of our opinion, a bill was introduced in the 1990 session of the Legislature that would have enacted essentially the same "ethics" provisions for members of the Prince George's County Council that were effectively stricken by us in *Porten Sullivan.* The bill passed the Senate but died in the House of Delegates. In 1992, a second attempt met the same fate; Senate Bill 701 passed the Senate but was rejected by the House of Delegates.

Undeterred, the Senate, in that same 1992 session, engrafted those provisions, in a modified form, onto another bill—House Bill 937—that dealt with planning and zoning matters in Montgomery County. As the bill reached the Senate, it was entitled "An Act concerning Maryland National Capital Park and Planning Commission—Montgomery County." The bill provided for changes in the planning commission appointment process, allowed the administration of an historic preservation grant in Montgomery County, clarified zoning in incorporated municipalities in that county, and addressed other

matters related to planning and zoning in Montgomery County. In an effort to enact the provisions that had twice been rejected by the House of Delegates, the Senate added them to House Bill 937, causing it then to contain an amendment to the State election code, a prohibition against political contributions from developers to the Prince George's County Executive and members of the County Council, a requirement that those officials disclose certain communications, and an authorization for the State Ethics Commission to enforce those provisions. The title was amended to read "An Act Concerning Montgomery and Prince George's County—Miscellaneous Planning and Zoning Provisions." The House of Delegates concurred in the amendments, and so the bill passed and was signed into law.

Noting the obvious fact that the planning and zoning provisions applicable to Montgomery County had "no relation" to the ethical standards sought to be applied to the Prince George's County Executive and Council, we reached "only one reasonable conclusion"—that the two sets of provisions married by the bill were "indeed 'distinct and incongruous' and 'distinct and separate.' " *State v. Prince Georgians, supra,* 329 Md. at 75, 617 A.2d at 589. On the authority of *Porten Sullivan,* we held that the Act violated the "single subject" mandate of Art. III, § 29. *Id.*

A different, but entirely consistent, result was reached in *Md. Classified Employees Assoc., supra,* 346 Md. 1, 694 A.2d 937. The Act challenged there began as a bill to establish a pilot program of "welfare reform" in three subdivisions—Baltimore City and Anne Arundel and Prince George's Counties. Essentially, it required AFDC recipients to cooperate in attempts to establish paternity, to participate in job training and job search activities, and, after a certain period, to find suitable work. While that bill (Senate Bill 754) was pending in the Senate, the House of Delegates was considering another bill (House Bill 1177) that directed the Department of Human Resources to create a pilot program in Baltimore City and two unnamed counties to "privatize" the collection of child support. Evidence presented at a committee hearing on that bill de-

scribed a dismal record of collections by the public agencies and more encouraging results from some private programs in other States. The House of Delegates amended HB 1177 in a number of respects, including the addition of a provision that required the suspension of drivers' licenses of persons in default on their child support obligations. The announced intent was to create "one omnibus child support enforcement bill." The bill passed the House of Delegates but was defeated in the Senate. The House of Delegates, however, then amended Senate Bill 754 to add to it the driver's license suspension provision, a provision that limited the additional benefits an AFDC recipient could receive by reason of the birth of another child, and the "privatization" provisions from HB 1177. As so amended, the bill passed both Houses and became law. It was then challenged on the ground that the "privatization" of child support collection provisions were disparate from the AFDC provisions, and that the Act thereby violated Art. III, § 29.[4]

Citing *Porten Sullivan,* we noted that the proper application of the "single subject" clause "requires consideration of how closely connected and interdependent the several matters contained within an Act may be" and that "notions of connection and interdependence may vary with the scope of the legislation involved." *Md. Classified Employees Assoc., supra,* 346 Md. at 14, 694 A.2d at 943 (quoting *Porten,* 318 Md. at 407, 568 A.2d at 1120). *Porten Sullivan* and *Prince Georgians,* we said, "illustrate the kind of circumstance in which the 'single subject' requirement is, in fact, violated." *Id.* at 15, 694 A.2d at 943. We explained that connection and interdependence can be on either a horizontal or vertical plane: "[t]wo matters can be regarded as a single subject, for purposes of § 29, either because of a direct connection between them, horizontally, or because they each have a direct connection to

---

**4.** The challenge was only that the Act embraced more than one subject. No complaint was made about the title. The title reflected the various individual provisions but stated that the Act related to the reform of welfare and child support enforcement in the State, which was the unifying theme and single subject.

a broader common subject to which the Act relates." *Id.* at 15–16, 694 A.2d at 944. Quoting *Baltimore v. Reitz,* 50 Md. 574, 579 (1879), we iterated that "[i]f several sections of the law refer to and are *germane* to the same subject-matter, which is described in its title, it is considered as embracing but a single subject, and as satisfying the requirements of the Constitution in this respect." *Md. Classified Employees Assoc., supra,* 346 Md. at 16, 694 A.2d at 944.

Applying that principle, we had no difficulty sustaining the Act, the "unmistakable objective" of which was to break the cycle of dependence on Government assistance. Although the major thrust of the Act "was to substitute earnings from employment for 'welfare,' " from its inception the bill "recognized the role of child support enforcement in detaching people from AFDC." *Id.* at 17, 694 A.2d at 945. The Legislature understood, we said, that, for some recipients, "the only practicable alternative to AFDC, at least for a time, was the regular receipt of court-ordered child support from the noncustodial parent." *Id.* at 18, 694 A.2d at 945. The nexus between child support enforcement and weaning people off of AFDC had long been recognized both by Congress and the Maryland General Assembly. The abundant evidence, we concluded, "demonstrates not just a close connection, but a true interdependence, between effective child support enforcement and the goal of significantly reducing the number of people relying on AFDC," and thus we held it "clear beyond cavil that Senate Bill 754 *did* embrace but a single subject, of which the pilot program of 'privatizing' child support enforcement in Baltimore City and Queen Anne's County was a legitimate part." *Id.* at 20–21, 694 A.2d at 946. That general purpose, as we noted, was clearly and expressly reflected in the title.

The final case, *Migdal v. State,* 358 Md. 308, 747 A.2d 1225 (2000), presented another inappropriate attempt to include two disparate provisions in a single bill. House Bill 356, introduced at the request of some firms in the mutual fund industry, would have amended § 2–405 of the Corporations and Associations Article to overturn a ruling of a New York

Federal court and provide that investment company directors who are not "interested persons" as defined by the Federal Investment Company Act of 1940 would be deemed to be independent and disinterested directors under the State corporation law. That bill passed the House of Delegates but failed in the Senate.

Faced, as a result, with a threat by some of the Maryland mutual fund companies to reincorporate in Delaware, the provisions of HB 356 were amended onto a completely unrelated Senate Bill then pending in the House of Delegates. That bill—Senate Bill 468—dealt with resident agents of corporations and was principally for the purpose of prohibiting an entity required to have a resident agent from designating a person as the resident agent without that person's written consent. It had nothing whatever to do with directors. With those amendments, and amendments to the title to reflect the new provisions, SB 468 passed, became law, and was promptly challenged under Art. III, § 29.

The State contended that the two purposes were germane because they embraced the single subject of corporations and associations and both amended the Corporations and Associations Article of the Code. Citing *Porten Sullivan,* we rejected that argument, noting the tenuousness of any connection between resident agents and directors and holding that the two provisions were completely separate and unrelated. The notion that two entirely disparate provisions may be regarded as a "single subject" because they each relate in some way to corporations or because they amend the same Article of the Code is, of course, preposterous, for, if that were the case, there would be little meaning to the Constitutional mandate. *See Migdal, supra,* 358 Md. at 318–19, 747 A.2d at 1230–31.

The present case is a virtual "repeat" of what occurred in *Porten Sullivan,* in *Prince Georgians,* and in *Migdal.* There is no connection whatever between the provisions relating to the Public Utility Regulation Fund and those purporting to retroactively excuse the PSC from compliance with the APA. There is clearly no direct, horizontal connection or

interdependence between them. The argument offered by the PSC, OPC, and the Alliance—that both provisions are germane, on a vertical basis, to the single subject of "the efficient operation" or "the effective funding" of the PSC—is tenuous, at best, in light of what we said and held in *Porten Sullivan* and *Migdal.* Even if we were to accept that argument, however, and conclude that both sets of provisions could be regarded, in a conceptual sense, as relating to the broader subject of the efficient operation or effective funding of the PSC, there is nothing whatever in this record to suggest that the Legislature viewed those provisions as having that connection, and, even more important, nowhere is that broader subject reflected in the title to the Act. The Act thus fails both requirements of the Constitution.

This is not a mere technicality. The history of what occurred here strikes at the heart of the purpose of Art. III, § 29, as described nearly 150 years ago in *Davis.* In 1978, the General Assembly made a conscious and deliberate decision to require the PSC to comply with the regulation-making provisions of the APA, from which it had previously been exempt, and thus to extend some legislative oversight into that process. Over the years, the Legislature has jealously guarded and exercised that oversight—requiring that proposed regulations be published in the Maryland Register for public comment, that they be submitted for review by the AELR Committee, and, upon any objection registered by that Committee, that they be personally approved by the Governor before the regulations can take effect.

The amendments added to HB 135 late on the last night of the session did away with that oversight, both prospectively and retroactively, and they were added without ever informing the members of either House.[5] When asked to approve the

---

5. The suggestion offered by OPC that §§ 2 and 3 merely "reaffirm[ed] and clarif[ied] [the Legislature's] prior grant of authority" and thus effected no substantial change in the law is wholly without merit. It flatly ignores our holding that the PSC cannot escape the requirements of the APA by simply calling a regulation an order—that when an order, by reason of its content, falls within the APA definition of a "regula-

Conference Committee Report, the members were told only that the bill related to the non-lapsing fund and, as to that subject, had been conformed to the Senate version. Nothing was said about the dramatic surrender of legislative oversight over a process that directly affects almost every resident and every business entity in Maryland. As was the case in *Davis,* "foreign matter [was] stealthily incorporated into a law, during the haste and confusion ... incident upon the close of the [session]" and the Code thus shows "the existence of enactments, that few of the members of the legislature knew any thing of before." *Davis, supra,* 7 Md. at 160. As was the case in *Porten Sullivan,* any legislators who may have been aware of what the Conference Committee actually did were then put in the very position from which § 29 was designed to protect them—of having to accept the broad surrender of legislative oversight in order to secure the special funding provisions which, in one form or another, they had previously approved.

For the reasons stated in *Porten Sullivan, supra,* 318 Md. at 410–11, 568 A.2d at 1122, *Prince Georgians, supra,* 329 Md. at 76–77, 617 A.2d at 589–90, and *Migdal, supra,* 358 Md. at 323–24, 747 A.2d at 1233, we hold that §§ 2 and 3 of the Act—the offending sections—are severable and that the other parts of the Act that relate to the funding of the PSC and OPC remain unaffected by our ruling in this case.

## ARTICLE 8

Article 8 of the Maryland Declaration of Rights states that "the Legislative, Executive, and Judicial powers of Government ought to be forever separate and distinct from each

---

tion," the PSC must comply with the regulation-making requirements of the APA. We are admonished by OPC not to "lose sight of the reason why the single subject doctrine developed as a judicial rule of State Constitutional construction"—to "protect the legislative process." Apart from the fact that the single subject doctrine was *not* developed as a "judicial rule," but was inserted directly into the Constitution by the people of Maryland, on three separate occasions, it is not we who have lost sight of its purpose.

other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

In our earlier opinion in this case, we concluded that PSC Order No. 76292 was ineffective because it constituted a regulation under the APA but had not been adopted in conformance with the requirements of that Act. The effect of that conclusion was a judicial determination, in an appeal from a Circuit Court ruling in a declaratory judgment action, that the utilities subject to the order, which were parties to the case before us, were not bound by the order because (1) it had not been entered in a case-specific, contested case proceeding to which any of the utilities were a party, and (2) as an order of general applicability, it had not been validly adopted. In enacting the provisions embodied in §§ 2 and 3 of Chapter 494 without exempting from those provisions Order No. 76292, the General Assembly purported to declare that Order No. 76292, which we held was ineffective, was effective. The question that we asked to be argued is not whether, by appropriate legislation, the General Assembly can save *other* orders of the PSC from the effect of our decision, either prospectively or retroactively, but whether it can save Order No. 76292 from that decision—whether its attempt to do so constitutes a judicial act that, under Article 8, is not within its Constitutional jurisdiction or competence.

Upon a review of the relevant case law, it is clear to us that the question is a substantial one. Because of our conclusion that §§ 2 and 3 of Chapter 494 are invalid under Article III, § 29 of the Constitution, however, it is one that we need not address at this time. The mandate attached to our earlier opinion, as modified below, remains effective.

JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO ENTER DECLARATORY JUDGMENT UNDER PUBLIC UTILITIES ARTICLE, § 3–201 THAT DIRECTIVES CONTAINED IN ORDER NO. 76292 ARE INEFFECTIVE FOR THE REA-

SONS STATED IN THIS OPINION AND THE OPINION FILED APRIL 8, 2002; COSTS IN THIS COURT AND IN CIRCUIT COURT TO BE PAID BY PUBLIC SERVICE COMMISSION; MANDATE TO ISSUE FORTHWITH.